UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In the matter of :

    SIDNEY DION MULDREW,

             Debtor

_____/

NUVELL CREDIT COMPANY, LLC,

             Appellant,

v.

SIDNEY DION MULDREW,

             Appellee.

_____/

Case No. 08-11866

Hon. AVERN COHN

## MEMORANDUM AND ORDER REVERSING THE BANKRUPTCY COURT'S DECISION AND REMANDING FOR FURTHER CONSIDERATION

### I. Introduction

This is a bankruptcy appeal in relation to Article 9 of the Uniform Commercial Code ("UCC"). The case itself presents a novel question at the intersection of the Bankruptcy Code and "negative equity" in motor vehicle financing, an issue that has been reviewed by only six district courts and one circuit court, the Eleventh. Nuvell Credit Company LLC ("Nuvell") appeals the bankruptcy court's ruling that negative equity on a trade-in vehicle is not part of the purchase money security interest ("PMSI") retained by a seller who financed a new vehicle sale and subsequently assigned its contractual rights to Nuvell. For the reasons below, the Court will reverse. As will be explained, the financing of the new vehicle included the financing necessary to clear title

to the trade-in vehicle, which the buyer offered as down payment in the deal he negotiated with the seller. A negative equity in the trade-in vehicle resulted, which was directly in connection with the seller's acquisition of secured rights in the new vehicle as collateral. Therefore, the negative equity is part of the PMSI.

## II. Background

### A. Facts

Although the facts are not at issue, some background will help frame the legal question. On November 17, 2005, Appellee Sidney Muldrew ("Muldrew") bought a new 2005 Chevrolet Malibu ("Malibu") from Graff Chevrolet, Pontiac, Oldsmobile ("Graff") in Durand, MI. Graff financed Muldrew's purchase through a retail installment sale contract ("Contract")[1], which was subsequently assigned to Nuvell. As part of the deal, Muldrew traded in his 2004 Chevrolet Cavalier, receiving $7,500 off the cash price, and Graff paid off the existing lien of $13,288.40.

The difference between Graff's trade-in allowance on the Cavalier and Muldrew's unpaid balance on the lien resulted in a deficit, or "negative equity," of $5,788.40. This $5,788.40 became the non-taxable part of the cash price of the Malibu and was rolled into the taxable cash price of $20,860.43, along with sales tax and preparation fee, resulting in a total cash price of $27,979.96. The total cash price was then reduced by a cash down payment of $98.50 and a rebate of $3,250.00, leaving a balance of $24,631.46 to be financed along with insurance, licensing, and transfer fee. The amount financed was $25,149.46 and the interest rate was 9.95%. The itemization in

---

[1]An excerpt of the Contract is attached as Exhibit A.

the Contract was in accord with an example promulgated by Michigan's Financial Institutions Bureau in Michigan Vehicle Bulletin 1999-1.

Two years later, on November 15, 2007, Muldrew filed for Chapter 13 bankruptcy. He listed only three creditor claims in his plan: (1) Furniture Row, with a crammed-down market value of $300 at 5%, for 53 monthly payments of $6.39; (2) Nuvell, with a crammed-down market value of $15,317.00 at 7.5%, for 53 monthly payments of $347.41[2]; and (3) the IRS, with $2,900 at 0%. After trustee's and attorney fees and the IRS priority claim, Muldrew listed $101.54 in available funds with which to pay unsecured creditors. Nuvell objected to the cramming down of its PMSI and filed a proof of claim for $21,398.60 at 9.95% interest.[3] The bankruptcy court bifurcated Nuvell's claim according to Muldrew's proposal, ruling that Nuvell did not have a PMSI in the Malibu to the extent that the negative equity resulting from the Cavalier trade-in was financed in the amount of $5,788.40.

### B. Law

### 1. The Law Prior to 2005

The Court adopts the background that follows from Nuvell's briefs. Prior to enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), the Bankruptcy Code allowed a Chapter 13 debtor to modify the rights of a secured creditor with a PMSI in a vehicle by bifurcating the claim into secured and

---

[2]$15,317 paid at 7.5% over 53 months would be closer to $340.40 per month. It is not clear why Muldrew thinks the interest rate of the undisputedly secured amount can be crammed down. At the Contract rate of 9.95%, payments would be $358.32.

[3]$21,398.60 paid at 9.95% over 53 months would be $500.58 per month. If monthly payments were set at $358.32, this would take 83 months to pay off.

unsecured portions, based on the vehicle's present value.  11 U.S.C. §§ 1325(a)(5), 506(a)(1).  Thus, the creditor had a secured claim to the extent of the value of the collateral and an unsecured claim to the extent the creditor's claim exceeded the value of the collateral.  That portion of the creditor's claim allowed as secured would be paid in full with interest, while the unsecured portion would be paid pro-rata with other general unsecured claims.[4]  Under the pre-2005 rules, the creditor's secured claim did not extend beyond the value of the collateral; it was irrelevant what caused the remaining balance of the contract to be greater than the value of the vehicle.  Such a result in a Chapter 13 plan is sometimes referred to as a "cramdown."

### 2.  Bankruptcy Abuse Prevention and Consumer Protection Act of 2005

Congress viewed the pre-2005 use of cramdown relating to motor vehicles as abusive: "[T]hrough the BAPCPA amendments to § 1325(a)(5), Congress was attempting to remedy a perceived abuse by those who buy vehicles on credit on the eve of bankruptcy and then utilize the cramdown provisions of the Bankruptcy Code to pay the secured creditor a lesser amount than its full claim."  In re Payne, 347 B.R. 278, 281 (Bankr. S.D. Ohio 2006).  To cure this abuse, Congress amended § 1325 to give motor vehicle financiers special protection against a cramdown.  Under BAPCPA, claims of creditors who finance the purchase of a motor vehicle acquired for the debtor's personal use within 910 days preceding bankruptcy are treated more favorably than other

---

[4]For example, if a debtor bought a car for $20,000 and financed the purchase price, then filed a Chapter 13 petition one year later when the value of the car had dropped to $13,000, the debtor could propose a plan that would pay only $13,000 as a secured claim with interest, and pay the unpaid balance of the debt pro-rata with the other general unsecured creditors.

secured claims: the secured claims of motor vehicle purchase-money financiers are no longer limited to the value of the financed vehicle.  This new treatment is required by the "hanging paragraph" of § 1325(a),[5] which provides protection from cramdown for secured creditors with PMSIs in vehicles acquired by a debtor for personal use within 910 days prior to the bankruptcy filing.

### III.  Legal Standard

This Court has appellate jurisdiction over final judgments, orders, and decrees of the bankruptcy court, and final disposition of discrete disputes may be appealed immediately.  28 U.S.C. § 158(a); In re Dow Corning Corp., 86 F.3d 482, 488 (6th Cir. 1996).  On appeal from the judgment of a bankruptcy court, "a district court reviews the bankruptcy court's findings of fact under the clearly erroneous standard but reviews de novo the bankruptcy court's conclusions of law."  In re Isaacman, 26 F.3d 629, 631 (6th Cir. 1994).  The only issue before the Court is the extent of Nuvell's PMSI; this is a question of law subject to de novo review.  The question involves the proper construction of the undefined term "purchase money security interest" in the hanging paragraph of § 1325(a) of the Bankruptcy Code.

--------------------

[5]The unnumbered paragraph appears at the very end of section 1325(a).  Here, for clarity, the paragraph will be designated with an asterisk.  The hanging paragraph provides:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a [PMSI] securing the debt that is the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle . . . acquired for the personal use of the debtor . . . .

11 U.S.C. 1325(a)(*).

The proper construction of "PMSI," which presents a question of law, is to be resolved by: (1) reference to the statutory text, (2) the goal that Congress sought to achieve in enacting the hanging paragraph, (3) the prevailing commercial practice at the time of its enactment, and (4) the pre-existing body of law, knowledge of which must be imputed to the enacting Congress. Here, the prevailing industry practice concerning negative equity was reflected in the pre-existing laws that also addressed the purchase-money financing of motor vehicles: the federal Truth in Lending Act, 15 U.S.C. §§ 1601 et seq., ("TILA"), state laws governing motor vehicle retail installment sales such as the Michigan Motor Vehicle Sales Finance Act ("MVSFA"), and Article 9 of the UCC. The relevant parts of these practices and laws will be explained under the Analysis section.

## IV. Analysis

### A. Parties' Arguments

Nuvell argues that the bankruptcy court erred in confirming Muldrew's plan because Nuvell's claim cannot be bifurcated into (1) a secured claim for the base price of the new vehicle, gap insurance, administrative fees, and taxes and (2) an unsecured claim for the negative equity expense. According to Nuvell, the bankruptcy court's decision is contrary to both the plain language and the legislative history of 1325(a)(*). Nuvell contends that the text of the hanging paragraph prohibits cramdown of any claim within its scope. The language contains no limitation, argues Nuvell, and does not require that the financing of the new motor vehicle secure only selected transaction costs.

Nuvell says that even though the hanging paragraph contains no definition of PMSI, the legislative history suggests that Congress believed the impact of the restriction would be widespread and encompass a significant percentage of purchase money transactions involving negative equity. Furthermore, Nuvell says, the titles of Section 306 and Subsection 306(b) of BAPCPA—the sections of the Public Law pursuant to which the hanging paragraph was enacted—demonstrate that the congressional intent in enacting the hanging paragraph was to restrict the ability of debtors to cram down secured claims of motor-vehicle financiers. The United States Supreme Court, Nuvell points out, has noted that "statutory title and section headings are tools available for the resolution of a doubt about the meaning of a statute." Fla. Dept. of Revenue v. Piccadilly Cafeterias, Inc., 128 S. Ct. 2326, 2336 (2008) (internal quotation marks omitted) (quoting Porter v. Nussle, 534 U.S. 516, 528 (2002)). Section 306 is entitled "Giving Creditors Fair Treatment in Chapter 13" and § 306(b) is entitled "Restoring the Foundation for Secured Credit." Nuvell also points to the Sixth Circuit's observation that "[b]ased upon legislative history, there is little doubt that the 'hanging [paragraph] architects intended only good things for car lenders and other lienholders.'" AmeriCredit Fin. Servs., Inc. v. Long, 519 F.3d 288, 294 (6th Cir. 2008) (quoting Keith M. Lundin, Chapter 13 Bankruptcy (3d ed. 2000 & Supp.2007-1)).[6]

Nuvell argues that the secured creditor protection policy applies with full force in the negative equity context. It says that the practice of rolling negative equity from a

---

[6]Long did not concern negative equity; rather, it dealt with the issue of whether the hanging paragraph applied where the debtor had surrendered the vehicle. The Sixth Circuit held that Congress left a gap on this question that for now should be filled by applying the pre-2005 law. Here, by contrast, Muldrew kept the Malibu.

trade-in into the purchase price of a new vehicle is common in vehicle financing and was common at the time Congress enacted BAPCPA; therefore, it is logical to presume that Congress was well aware of the practice and intended that § 1325(a)(*) protection extend to negative equity. Moreover, Nuvell says, car dealers must comply with TILA, which requires PMSI financiers to disclose negative equity and other transaction costs as part of the "amount financed" and the "total sale price" of the new vehicle. Congress, Nuvell contends, is presumed to have known about other relevant federal law governing purchase money financing of vehicle purchases.

Muldrew responds that because the hanging paragraph is an exception to the general rules favoring equal treatment of creditors and permitting debtors to modify claims, the Court should construe the elements narrowly. Howard Delivery Serv., Inc. v. Zurich Am. Ins., Co., 547 U.S. 651, 667 (2006) (equal distribution objective underlying the Bankruptcy Code requires that preferences be tightly construed). Muldrew asserts that a plain reading of the statutory language makes clear that the hanging paragraph applies only when the creditor holds a PMSI in the entire debt. Muldrew points out that the word "debt" appears five times in the hanging paragraph without modifying language such as "to the extent" or "portion of." By contrast, Muldrew says, other sections of the Code specifically use words "to the extent" or "any portion" to indicate applicability to all or part of the debt, claim or payments/property or lien at issue. See, e.g., 11 U.S.C. § 329(b) ("return of any such payment, to the extent excessive"; § 365(j) ("recovery of any portion of the purchase price"); § 506(b) ("To the extent that an allowed secured claim is secured by property…").

Expanding the definition of "purchase money obligation" to include an element that it has never included, Muldrew argues, "i.e. paying off antecedent debt," will result in giving these purchase money creditors greater protections, greater privileges, and greater benefits at the expense and detriment to the debtor's other creditors. Moreover, Muldrew says, redefining PMSI for the purpose of 1325(a)(*) will upset established priorities and the legitimate expectations of those who rely on them on a daily basis.

Nuvell also contends that because PMSI is not defined in the bankruptcy code, the Court should look to Article 9 and state laws governing motor vehicle retail installment sales for guidance in interpreting the meaning of § 1325(a)(*). Nuvell argues that under the UCC's definitions for "purchase-money collateral" and "purchase-money obligation," the "price" of a new vehicle includes the negative equity from a trade-in and the negative equity constitutes "value given to enable" Muldrew to acquire rights in or use the collateral—the Malibu. M.C.L. § 440.9103 & cmt.3. In addition, Nuvell points out, MVSFA explicitly authorizes the financing of negative equity as part of a single financing transaction. M.C.L. § 492.102(12). Nuvell encourages the Court to read Article 9 and MVSFA *in pari materia*, a doctrine it says that Michigan courts routinely apply. E.g., Kinder Morgan Mich., L.L.C. v. City of Jackson, 744 N.W.2d 184, 189 (Mich. Ct. App. 2007) ("Statutes that relate to the same subject or share a common purpose are *in pari materia*, and must be read together as one law even if they contain no reference to one another and were enacted on different dates.").

Muldrew responds that TILA and MVSFA have no bearing on the definition of PMSI under Article 9. In order for statutes to be read *in pari materia*, Muldrew says, they must be part of a common statutory scheme or share a common purpose.

Muldrew argues that, here, the "price of the collateral" is the sticker price of the new vehicle. The value a lender advances to a debtor, Muldrew says, is value that enables the debtor to pay off his existing car lender, not value that enables the debtor to buy the new car. Muldrew argues that the additional financing is simply a convenience and accommodation to the debtor. Muldrew says that Comment 3 to M.C.L. § 440.9103 includes in the "price" of collateral or the "value given to enable" the following: "obligations for expenses incurred in connection with acquiring the rights in the collateral, sales tax, duties, finance charges, interest, freight charges, cost of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney fees, and other similar obligations." Muldrew contrasts these expenses with the liability for negative equity, which he characterizes as "antecedent debt." Under § 440.9103, he says, there must be a close nexus between the purchase money obligation and the purchase money collateral, and negative equity fails this test.

Finally, Muldrew argues, including negative equity in a PMSI is bad public policy. "This manipulation," says Muldrew, "encourages a debtor who already has a vehicle with negative equity to roll that into the financing of yet another vehicle and protects the lender at the expense of other creditors." Muldrew contends that excluding negative equity is consistent with the purposes of the Bankruptcy Code in providing for the debtor's fresh start and the fair treatment of all creditors.

## B. Discussion

### 1. Case Law

#### a. Courts Finding that Negative Equity Is Part of a PMSI

Last month the Eleventh Circuit became the first federal court of appeals to rule on the exact issue that is before this Court.  In re Graupner, 537 F.3d 1295 (11th Cir. 2008).  The court held that under Georgia state law, the amount financed for negative equity is protected from cramdown by the hanging paragraph because negative equity is part of the price of the motor vehicle and is included in the motor-vehicle financier's PMSI.  Id. at 1301–02.  Discussing comment 3 to § 9-103 of the Georgia UCC, the court explained:

> The expenses listed in Comment 3 are merely examples of additional components of the "price" of the collateral or of "value given" to the debtor, and we see no persuasive reason why traditional transaction costs *and* the refinancing of reasonable, bona fide negative equity in connection with the purchase of the new vehicle should not qualify as "expenses" within the meaning of the comment.

Id. at 1302.  Financing of negative equity bears a close nexus to the purchase of the new vehicle, the transaction is a package deal, and the financing of the negative equity is an "integral part of" and "inextricably intertwined with" the sales transaction.  Id.  To hold otherwise would not be a fair reading of the UCC.  Id.

The court also relied on the legislative history of the hanging paragraph and industry practice.  Id.  In addition, the court found support for its conclusion by interpreting the Georgia UCC *in pari materia* with the Georgia MVSFA.  Id. at 1301.  The language of Georgia's MVSFA is somewhat different than that of Michigan's, but the court cited decisions in states other than Georgia that use a variety of language in their retail installment sales acts.  E.g., id. at 1301 n.3 (citing In re Schwalm, 380 B.R. 630 (Bankr. M.D. Fla. 2008) (negative equity is part of the "amount financed" and the "total sale price" in the Florida statute)).

Although the district and bankruptcy case law has been closely split for two years, a majority has recently emerged that holds negative equity to be included in the PMSI.  Four district courts now protect negative equity from cramdown: the Southern District of Texas in In re Dale, No. H-07-3176 (S.D. Tex. Aug. 14, 2008); the Eastern District of Virginia in GMAC v. Horne, 390 B.R. 191 (E.D. Va. 2008); the Middle District of Georgia in Graupner v. Nuvell Credit Corp., No.4:07-CV-37CDL, 2007 WL 1858291 (M.D. Ga. June 26, 2007), just affirmed by the Eleventh Circuit; and the Western District of New York in Gen. Motors Acceptance Corp. v. Peaslee, 373 B.R. 252 (W.D.N.Y. 2007) ("Peaslee II"), now on appeal to the Second Circuit.

One of the earliest cases finding that negative equity is part of the PMSI was decided by a bankruptcy court in this district, which held that the financing of negative equity from a lease contributed to the "value given to enable" the debtor to acquire the new vehicle, thus constituting purchase money as defined by section 9-103 of the Michigan UCC.  Transcript of Bench Opinion at 14, In re Honeycutt, No. 06-48771 (Bankr. E.D. Mich. Nov. 2, 2006).  The bankruptcy court recognized that the holding was supported by the Michigan MVSFA (Honeycutt Tr. 8.) and rejected as "nothing short of ridiculous" the debtor's argument that the contract price had been manipulated by the secured creditor with an evil intent to change unsecured debt into secured debt in anticipation of bankruptcy (Honeycutt Tr. 12.).  It was the debtor who preferred to roll her negative equity into the new contract.  (Honeycutt Tr. 13.)  "She could have continued to make her lease payments in addition to payments on a new car, but she chose not to do so."  (Honeycutt Tr. 13.)  The contract price was arrived at by "horse trading," as is common in the industry.  (Honeycutt Tr. 11.)  The purchase price was a

"package deal." (<u>Honeycutt</u> Tr. 13.) The bankruptcy court here distinguished <u>Honeycutt</u> because the trade-in was a lease rather than a purchased vehicle, but the court did not explain its thinking.

Many bankruptcy courts protect negative equity from cramdown.[7] Some bankruptcy courts have done so without any reliance on a state retail installment sales act.[8] For these bankruptcy courts, the UCC provides ample support for the conclusion that negative equity, extended warranties, and insurance coverage are protected as PMSI from cramdown under the hanging paragraph. In the past five months alone, five new bankruptcy courts have held that negative equity is part of the PMSI in vehicle financing. <u>In re Smith</u>, No. 07-30540 (Bankr. S.D. Ill. June 25, 2008); <u>In re Hampton</u>, No. 07-14990 (Bankr. S.D. Ohio June 16, 2008) (Bankr. S.D. Ohio electronic database); <u>In re Myers</u>, ___ B.R. ___, No. 07-11145, 2008 WL 2445214 (Bankr. S.D. Ind. June 13, 2008); <u>In re Ford</u>, 387 B.R. 827 (Bankr. D. Kan. 2008). In <u>Hampton</u>, a bankruptcy court for the Southern District of Ohio found the Sixth Circuit's <u>Long</u> decision to be controlling even though <u>Long</u> does not involve negative equity. <u>Id.</u> at 7. The bankruptcy court relied on the case for the common law principle of "the equity of the statute," which

---

[7]<u>E.g.</u>, <u>In re Shockley</u>, No. 07-15884 (Bankr. S.D. Ohio April 29, 2008); <u>In re Schwalm</u>, 380 B.R. 630 (Bankr. M.D. Fla. Jan. 16, 2008); <u>In re Brei</u>, 2007 WL 4104884 (Bankr. D. Az. 2007); <u>In re Petrocci</u>, 370 B.R. 489 (Bankr. N.D.N.Y 2007); <u>In re Cohrs</u>, 373 B.R. 107 (Bankr. E.D. Cal. 2007); <u>In re Bradlee</u>, 2007 Bankr. LEXIS 3863 (Bankr. W.D. La. 2007).

[8]<u>In re Austin</u>, 381 B.R. 892 (Bankr. D. Utah Feb. 12, 2008); <u>In re Dunlap</u>, 383 B.R. 113 (Bankr. E.D. Wis. Jan. 31, 2008); <u>In re Vinson</u>, 2008 WL 319678 (Bankr. D.S.C. Jan. 25, 2008); <u>In re Weiser</u>, 381 B.R. 263 (Bankr. W.D. Mo. 2007); <u>In re Wall</u>, 376 B.R. 769, 771 (Bankr. W.D.N.C. Sept. 17, 2007); <u>In re Burt</u>, 378 B.R. 352, 364 (Bankr. D. Utah 2007).

"requires that the interpreting court look to the public policy intended to be expressed in the enactment." Id. The bankruptcy court then quoted Long, in which the Sixth Circuit recognized that the purpose of the hanging paragraph is "anti-cramdown":

> "Without § 506, creditors falling within the scope of the hanging paragraph are fully secured so that when a debtor elects to retain the collateral, the debtor must propose a plan that will pay the full amount of the claim."
> Guided by these clear statements by the Sixth Circuit Court of Appeals, this Court is obligated to reach the conclusion that the hanging paragraph prohibits application of § 506, even though negative equity was present in the purchase transaction for that was within the intent of the enactment.

Id. at 8 (quoting Long, 519 F.3d at 294). Two of the lead cases that reached the opposite conclusion have been reversed by their respective federal district courts: In re Peaslee, 358 B.R. 545 (Bankr. W.D.N.Y. 2006) ("Peaslee I"), rev'd, Peaslee II, 373 B.R. at 262, and In re Pajot, 371 B.R. 139 (Bankr. E.D. Va. 2007), rev'd in relevant part, Horne, 390 B.R. at 204–06. Several cases permitting cramdown under the hanging paragraph rely on the reversed bankruptcy court decision in Peaslee I.[9] Even after Peaslee I was reversed, bankruptcy courts continued to rely on decisions such as Price and Pajot, now reversed, in which the analysis was supported largely by the now reversed Peaslee I, making the more recent decisions that permit cramdown suspect as

---

[9]The following decisions relied on the bankruptcy court's decision in Peaslee I prior to its reversal: Citifinancial Auto v. Hernandez-Simpson, 369 B.R. 36 (D. Kan. 2007), currently on remand to the bankruptcy court for a procedural issue from appeal to the Tenth Circuit; In re Acaya, 369 B.R. 564 (Bankr. N.D.Cal. 2007); In re Price, 363 B.R. 734 (Bankr. E.D.N.C. 2007), aff'd, Wells Fargo N.C. 1, Inc. v. Price, No. 5:07-CV-133-BR (E.D.N.C. 2007), currently on appeal to the Fourth Circuit; In re Westfall, 365 B.R. 755, (Bankr. N.D. Ohio 2007), adopted in part by In re Westfall, 376 B.R. 210, (Bankr. N.D. Ohio 2007), currently on appeal to the district court.

well.  See, e.g., In re Sanders, 377 B.R. 131 (Bankr. W.D. Tex. 2007) (currently on appeal to the district court).

### b.  Courts Finding that Negative Equity Is Not Part of a PMSI

No court of appeals has held that negative equity may be crammed down. Contrasted with the four district courts that protect negative equity from cramdown, only two district courts do not: the Eastern District of North Carolina in Wells Fargo, currently on appeal to the Fourth Circuit, and the District of Kansas in Citifinancial Auto v. Hernandez- Simpson, 369 B.R. 36 (D. Kan. 2007), now on remand to the bankruptcy court from the Tenth Circuit for resolution of a procedural issue.  It is interesting to note that the chief judge of the Kansas bankruptcy court has since found differently than the district court.  Ford, 387 B.R. at 830 ("This Court respectfully disagrees.").

Like the bankruptcy court in this case, a bankruptcy court of the Western District of Michigan found that negative equity is not part of the PMSI.  In re Nagel, Case No 06-02869 (Bankr. W.D. Mich. 2006).  A bankruptcy court of the Middle District of Tennessee rejected the argument that TILA and certain state motor vehicle sales finance provisions assist in determining whether a PMSI exists.  In re Hayes, 376 B.R.655, 658, 673 n.25 (Bankr. M.D. Tenn. 2007) (citing Pajot, 371 B.R. at 150, since reversed in relevant part).  The bankruptcy court also rejected the argument that the parties engaged in one transaction, the package deal notion that negative equity is incorporated into value given to enable the debtor to acquire rights in the collateral, and the close nexus argument.  Id. at 660–61.  The bankruptcy court believed "by its nature, negative equity is unsecured debt" and "the money advanced to pay off negative equity

. . . went to [the previous creditor] and was not actually used to pay for the [new vehicle]." Id. at 672–73.

One bankruptcy court found that the UCC and state automobile finance laws "do not relate to the same subject matter or do not have the same purpose." In re Lavigne, 2007 WL 3469454 at *7 (Bankr. E.D. Va. Nov. 14, 2007), *rev'd*, GMAC v. Horne, 390 B.R. 191, 202 (E.D. Va. 2008) (Both the state law and Article 9 "can be read to relate to the core aspects of the subject of financing of motor vehicle purchases[] and therefore, they may be read *in pari materia*."). Another found that the "price of the collateral" is not ambiguous but means "actual price" and "resort to the *in pari materia* doctrine would be improper." In re Blakeslee, 377 B.R. 724 (Bankr. M.D. Fla. 2007) (relying on the reversed Peaslee I, 358 B.R. at 556), *disagreed with by* In re Schwalm 380 B.R. 630 (Bankr. M.D. Fla. 2008) (adopting the reasoning of Peaslee II). TILA and motor vehicle sales statutes are disclosure or consumer protection statutes; the UCC, on the other hand, concerns the creation of security interests in goods and section 9-103 explains when a security interest enjoys purchase money status. In re Munzberg, 388 B.R. 529, 541–44 (Bankr. D. Vt. 2008) (relying in part on Lavigne, since reversed, to reject negative equity as part of PMSI); In re Sanders, 377 B.R. 836, 847–53 (Bankr. W.D.Tex 2007) (relying in part on Pajot, since reversed). Several other bankruptcy courts also permit cramdown of negative equity.[10]

## 2. This Case

---

[10]In re Look, 383 B.R. 210 (Bankr. D. Me. 2008); In re Acaya, 369 B.R. 564 (Bankr. N.D. Cal. 2007); In re Westfall, 376 B.R. 210 and 365 B.R. 755 (Bankr. N.D. Ohio 2007); In re Johnson, 380 B.R. 236 (Bankr. D. Or. 2007); In re Vega, 344 B.R. 616 (Bankr. D. Kan. 2006).

Muldrew does not dispute that the Malibu was purchased within 910 days of his bankruptcy filing or that it was acquired for his personal use. He disputes only whether the debt he owes Nuvell is secured by a PMSI within the meaning of § 1325. The issue in this case is whether a portion of Nuvell's PMSI in the vehicle that is the collateral for the obligation loses its protected status just because the financing was a package deal that included negative equity as part of the total cash sale price. The answer is no.

Because the Bankruptcy Code does not define "PMSI," the interpretation of the term for purposes of the hanging paragraph poses the question; the answer is the same under both federal and Michigan law. The question is answered by reference to the statutory text and the cramdown-abuse prevention goal that Congress sought to achieve. Congress does not legislate in a commercial and legal vacuum; it is deemed to act with an awareness of pertinent existing law and its treatment of related issues. Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 184–85 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts."). The issue must be analyzed in light of the legal and commercial environment within which Congress acted—the industry practices prevailing at the time the hanging paragraph was enacted and the pre-existing laws reflecting these practices.

In this instance, Congress legislated in a commercial and legal environment that featured three sets of pre-existing laws allowing for the inclusion of negative equity in motor vehicle retail installment sale contracts—TILA, Article 9, and state laws regulating retail installment sales contracts, such as the Michigan MVSFA. These statutes and the industry practices they allow informed congressional understanding of the term "PMSI" in the hanging paragraph. Section 1325(a)(*) protects purchase money creditors who

finance motor vehicle purchases from bifurcation of their claims—at least, according to the Sixth Ciruit in <u>Long</u>, when the debtor retains the collateral. The new car financing in this case was a "package," all of which qualifies for PMSI status under the plain language of the Bankruptcy Code, as well as under TILA, Article 9, and MVSFA. TILA requires PMSI financiers to disclose negative equity and other transaction costs as part of the "amount financed" and the "total sale price" of the new vehicle. The Court finds that under the UCC's definition for "purchase-money obligation," the "price" of a new vehicle includes the negative equity from a trade-in and the negative equity constitutes "value given to enable" a debtor to acquire rights in or use the collateral. M.C.L. § 440.9103 & cmt.3. "As used in subsection (a)(2) [sic], the definition of 'purchase money obligation,' the 'price' of collateral or the 'value given to enable' includes *obligations for expenses incurred in connection with acquiring rights in the collateral . . . .*" <u>Id.</u> cmt.3 (emphasis added). MVSFA defines "Cash price" as:

> the price measured in dollars at which the seller would in good faith sell to the buyer or to any other buyer *under like circumstances*, and the buyer would in good faith buy from the seller, the motor vehicle that is the subject matter of the installment sale contract if the sale were a sale for cash instead of an installment sale.

M.C.L. § 492.102(10) (emphasis added). MVSFA does not say that cash price equals sticker price, but looks to the circumstances of the sale. Further, MVSFA explicitly authorizes as one single financing transaction the financing of "the unpaid cash price balance," which includes "other costs necessary or incidental to the sale . . . which the seller contracts to pay on behalf of the buyer":

> "Principal amount financed" means *the unpaid cash price balance after* deducting the down payment, adding the cost of any insurance premiums required or obtained as security for or by reason of the sale of a

18

motor vehicle under an installment sale contract, and *adding other costs necessary or incidental to the sale of the motor vehicle under the contract which the seller contracts to pay on behalf of the buyer* and for the amount of which the seller agrees to extend credit to the buyer and for which the buyer contracts voluntarily.

Id. § 492.102(12) (all emphases added).  The necessary or incidental costs "which the seller contracts to pay on behalf of the buyer" would include the outstanding loan amount on the Cavalier that Graff paid on behalf of Muldrew.  Moreover, MVSFA authorizes the Commissioner of the Financial Institutions Bureau as administrator to prescribe the minimum information set forth in an installment sale contract.  M.C.L. § 492.112(b).  The Commissioner promulgated the required disclosures along with a sample contract that shows negative equity included in the calculation of the "total cash price of the installment sale transaction."  Gary K. Mielock, Acting Commissioner, Financial Institutions Bureau, Motor Vehicle Bulletin 1999-1, "Disclosure of Negative Equity on an Installment Sale Contract," July 6, 1999.

> The Court agrees with the Eleventh Circuit:
>
> If Congress did not intend for the hanging paragraph to apply to a trade-in's negative equity, as the Debtor ultimately contends, it would have the effect of excluding a substantial number of lawful auto finance transactions that were industry practice when BAPCPA was enacted (a practice that Congress is presumed to have known about).  This would be an absurd result given that it is recognized that the "architects [of the hanging paragraph] intended only good things for car lenders and other lienholders."

Graupner, 537 F.3d at 1303 (internal quotation marks omitted) (quoting Long, 519 F.3d at 294).  As the Sixth Circuit noted in the case that the Eleventh Circuit quoted, a case involving a debtor who surrendered her car, "[w]ithout § 506, creditors falling within the scope of the hanging paragraph are fully secured so that when a debtor elects to retain

the collateral, the debtor must propose a plan that will pay the full amount of the claim." Long, 519 F.3d at 294. Here, Muldrew has retained the Malibu. The Court agrees with Muldrew that the hanging paragraph applies when the creditor holds a PMSI in the entire debt—and the Court finds that Nuvell holds a PMSI in the entire debt that Muldrew created when he bargained with Graff to finance Muldrew's purchase of a new Malibu.

In finding that negative equity is not part of the PMSI, a bankruptcy court of the Middle District of Tennessee said, "In UCC parlance, the [trade-in] payoff portion of the loan may be secured by the purchase money collateral . . ., but it is not a purchase money obligation with respect to the new car." Hayes, 376 B.R. at 673. With all due respect to the bankruptcy court, this is a distinction without a difference, at least in Michigan. In Hayes, as here, the dealer gave the debtor a trade-in allowance. A trade-in allowance *directly* affects the cash price—it is subtracted during calculation of the total cash price. In order for the trade-in allowance to have any role in the deal, the dealer must pay, out of pocket, any outstanding lien on the trade-in vehicle. The value given by the dealer for the negative equity *enables the debtor to buy the new vehicle at the negotiated total cash price*. If the negative equity should be subtracted from the PMSI, then the trade-in allowance should be added back in to the purchase price. Here, as in many cases, this would result in an even higher PMSI. If the trade-in allowance is added back in to the purchase price, the trade-in vehicle must be returned to the debtor. Of course, such an unraveling of an intertwined negotiated deal several years out is neither possible nor desirable.

"PMSI" has no special meaning under the Bankruptcy Code.  Graff paid money out of pocket to pay off Muldrew's loan on the Cavalier and to enable Muldrew to reduce his purchase price of the Malibu by trading in the Cavalier.  The agreement was that Graff would include the negative equity that resulted as part of the total purchase price to be financed, and Muldrew pledged the Malibu as purchase money collateral for the entire amount.

## V.  Conclusion

The amount Muldrew financed to pay off the negative equity on his trade-in vehicle involved a new, smaller amount, a new lender, a new piece of collateral, and a new contract.  In short, it was not "antecedent debt."  The negative equity was part of the bargained-for total cash price of the new vehicle Muldrew financed with Graff, as well as the value Graff gave to enable Muldrew to gain rights to and enjoy use of the collateral.  A closer nexus to the collateral can hardly be imagined.  Therefore, the Court holds that Nuvell has a PMSI in the total outstanding balance on the purchase money loan Graff made to Muldrew.  Accordingly, the decision of the bankruptcy court is REVERSED and this matter is REMANDED to the bankruptcy court for further proceedings consistent with this opinion.

**SO ORDERED.**

Dated:  October 3, 2008            s/Avern Cohn_____
                                   AVERN COHN
                                   UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, October 3, 2008, by electronic and/or ordinary mail.

                                   s/Julie Owens_____
                                   Case Manager, (313) 234-5160